## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIA SILVERA, ADMINISTRATRIX | : | |
| OF ESTATE OF ANDRE MARIO LYLE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 3:09CV1398 (MRK) |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTIONS, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

This case arises out of the tragic suicide death of 22-year-old Andre Mario Lyle while he was being held as a pretrial detainee at the Garner Correctional Institute in Newtown, Connecticut on the evening of May 22, 2008.  Plaintiff, the authorized representative of Mr. Lyle's estate, has filed an eight-count amended complaint against the Connecticut Department of Corrections (DOC); the University of Connecticut Health Center's Correctional Managed Health Care (CMHC); and five individuals, who are sued in their personal and individual capacities: Dr. Peter Gasparo, Counselor Samson, Lieutenant Gagnon, and Corrections Officers Swan and Standish (collectively, "Defendants").  *See* Second Am. Compl. [doc. # 31].  Counts One and Two, against Dr. Gasparo and Counselor Samson, respectively, allege the denial of adequate mental health care.  Count Three, against Lt. Gagnon, and Count Four, against Officers Swan and Standish, allege violations of substantive due process.  The remaining counts are against all Defendants.  Counts Five through Seven claim violations of the equal protection provisions of the Fourteenth Amendment of the U.S. Constitution and Sections 9 and 20 of Article First of the Connecticut Constitution, and are premised on two grounds: Mr. Lyle, a pretrial detainee, being

1

forced to share a cell with a convicted inmate and being treated differently from those similarly-situated with regard to the mental health care that he received.  Finally, Count Eight alleges a statutory cause of action for wrongful death.

On December 15, 2009, Defendants filed a Motion to Dismiss [doc. # 25].  The Court later held a telephonic status conference, during which it granted Plaintiff an opportunity to amend her complaint one last time in order to address the alleged deficiencies identified in Defendants' motion.  *See* Order dated Dec. 22, 2009 [doc. # 27].  Defendants' Motion to Dismiss [doc. # 25] was denied for the time being, but without prejudice to renewal after Plaintiff amended her complaint.  *See id.*  Thereafter, on January 15, 2010, Plaintiff filed a 58-page Second Amended Complaint [doc. # 31], containing the counts and allegations described above.

Now pending before the Court is the Defendants' renewed Motion to Dismiss [doc. # 35], which asks the Court to dismiss the Second Amended Complaint (hereinafter, "Complaint") in its entirety.  On Counts One and Two, alleging a denial of adequate mental health care, Defendants Dr. Gasparo and Counselor Samson argue that the allegations in the Complaint, even if accepted as true, reveal at most merely a disagreement about the proper course of Mr. Lyle's mental health care treatment, and therefore do not adequately state a claim for relief.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") [doc. # 36] at 17-23.  Lt. Gagnon argues that Count Three, which seeks to hold him – and, by extension, the DOC – accountable as the supervisor and policy maker, is insufficient under *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) because the Complaint contains insufficient allegations of his personal involvement in the alleged constitutional deprivations.  *See* Defs.' Mem. [doc. # 36] at 17-23.  Defendants argue that Count Six and that portion of Count Five that is premised on Mr. Lyle being housed with a convicted inmate fail to state a constitutional deprivation under either the federal or state

constitutions, as Mr. Lyle did not have a constitutional right to be housed separately from convicted inmates. *See id.* at 23-24. As for Mr. Lyle's equal protection claims based on being treated differently with regard to mental health care than others similarly situated (Count Seven and part of Count Five), Defendants argue that Plaintiff has failed to allege any facts to support the claim that he was treated differently for any impermissible reason. *See id.* at 24-26. Defendants say that Plaintiff's allegations on her claim for wrongful death (Count Eight) do not amount to recklessness, and therefore are inadequate to overcome the statutory immunity they enjoy by virtue of Conn. Gen. Stat. § 4-165 (Count Eight). *See* Defs.' Mem. [doc. # 36] at 13-15. Defendants also argue that insofar as they are sued in their official capacities, this Court lacks subject matter jurisdiction due to sovereign immunity, *see id.* at 11-13; that they are entitled to qualified immunity, *see id.* at 29-33; and that, for prudential reasons, insofar as the state-law claims survive the motion to dismiss, the Court should refrain from exercising supplemental jurisdiction over them, *see id.* at 27-29. Plaintiff, of course, disputes all of Defendants' arguments for dismissal. *See* Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Mem.") [doc. # 41-1].

While the Court agrees that Defendants are entitled to dismissal on some of Plaintiff's claims, the Court declines to dismiss this case in its entirety. Thus, for the reasons and to the extent explained below, Defendants' Motion to Dismiss [doc. # 35] is GRANTED in part and DENIED in part.

## I.

The function of a motion to dismiss is to determine whether the plaintiff has stated a legally-cognizable claim that, if proven, would entitle it to relief. Due to this circumscribed purpose, when considering a motion to dismiss the Court accepts as true all factual allegations in

the complaint and draws all inferences from these allegations in the light most favorable to the plaintiff.  *See Hemi Group, LLC v. City of New York, N. Y.*, ___ U.S. ___, ___, 130 S.Ct. 983, 987 (2010); *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S.Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009).

Two working principles underlie the Supreme Court's plausibility standard.  *See Iqbal*, 129 S.Ct. at 1949.  "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949).  That said, the Rule 8 pleading threshold "does not require 'detailed factual allegations,' [though] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S.Ct. at 1949.  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss'" and 'determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id*. (quoting *Iqbal*, 129 S.Ct. at 1950); *see also Austen v. Catterton Partners V, LP*, ___ F. Supp. 2d ___, ___, 2010 WL 625389, at *2 (D. Conn. Feb. 17, 2010) (discussing the importance of "[c]ontext, good judgment and common sense" in applying the *Iqbal* standard to motions to dismiss).

## II.

The following facts are taken from the Complaint [doc. # 31] and are taken as true for

present purposes.  The Court assumes the parties' familiarity with these facts, and will only set out those necessary for resolution of Defendants' motion; additional facts will be introduced below in discussing the individual claims.

Andre Lyle was arrested on April 11, 2008 in the Town of Manchester, Connecticut, and was arraigned three days later on April 14 by Superior Court Judge Ward.  Mr. Lyle's criminal case was continued until May 6, 2008, and Judge Ward remanded him to the custody of the DOC and ordered that he be subject to a mental health watch out of concerns that Mr. Lyle could harm himself.  Following his arraignment, Mr. Lyle was transported to the Hartford Correctional Center (HCC), where he was examined by mental health professionals.  Pursuant to the DOC's initial classification procedures, Mr. Lyle was classified as a "Mental Health Need 5" ("MH5") – the highest level of the DOC's mental health classification system, indicating a "[c]risis level mental disorder" that "[r]equires 24 hour nursing care" due to, *inter alia*, the risk of suicide or self-mutilation.  *See* DOC Objective Classification Manual 29-30 (rev. July 2005).[1]  Mr. Lyle was placed on suicide watch and prescribed Risperadol, an anti-psychotic drug, and Effexor, an anti-depressant.

Mr. Lyle was evaluated two days later, on April 16, and that evaluation resulted in a downgrade of his Mental Health Need to level 3 ("MH3"), indicating the belief that he was no longer a threat to himself.  *See id.*  Mr. Lyle was also transferred from suicide watch to an orientation housing unit at HCC.  Nonetheless, Mr. Lyle was still experiencing thoughts of despair, as indicated in a letter he wrote to a friend on April 30, in which he said that he hoped prison would not "lead to my end" and that sometimes he did not "even want to live."  Compl.

---

[1]   The DOC Manual is available at http:/www.ct.gov/doc/lib/doc/PDF/PDFReport/ClassificationManualLibraryCopy.pdf.

[doc. # 31] ¶ 15.  Plaintiff alleges that, in accordance with DOC policy, this letter was screened by unknown DOC personnel, who nonetheless failed to communicate its contents to the mental health staff.  *See id.* ¶ 16.  Plaintiff also alleges that on May 5, Mr. Lyle complained to medical staff of chest pains, which were diagnosed as "ineffective coping" and allegedly dismissed as a product of Mr. Lyle's continued depression.  *See id.* ¶ 17.

On May 6, 2008, Mr. Lyle appeared in criminal court, where his case was continued.  Mr. Lyle was returned to HCC, and two days later, on May 8, he requested a consultation with the medical staff.  Mr. Lyle complained of difficulty sleeping and experiencing thoughts of suicide.  *See id.* ¶ 18.  Plaintiff also alleges that HCC's custodial staff had reported to the health care professionals that Mr. Lyle had been observed crying in his cell.  As a result of the consultation, Mr. Lyle was reclassified as MH5 and placed again on suicide watch.  *See id.* ¶¶ 18-19.  Mr. Lyle was reexamined on May 11, but no changes were made to his Mental Health Need classification.

Mr. Lyle remained at HCC on suicide watch until May 13, when the mental health staff arranged for him to be transferred to the Garner Correctional Institute ("Garner") out of concerns that he was actively suicidal.  *See id.* ¶¶ 21-22.  Upon arrival at Garner, Mr. Lyle was examined and classified as MH4, indicating a "[m]ental [h]ealth disorder severe enough to require specialized housing or ongoing intensive mental health treatment."  DOC Objective Classification Manual 29.  In accordance with that classification, Mr. Lyle was placed in a specialized housing unit at Garner.  *See* Compl. [doc. # 31] ¶ 28.  On May 15, Mr. Lyle was evaluated by Defendant Dr. Gasparo, a psychiatrist and a contract employee of CMHC.  Plaintiff alleges that Dr. Gasparo is the individual primarily responsible for the delivery of mental health care services for the DOC, including at Garner.  *See id.* ¶ 6.  Plaintiff alleges that when Dr.

Gasparo evaluated Mr. Lyle on May 15, he knew that Mr. Lyle had previously attempted suicide, and that he had been transferred to Garner for fear that he would again attempt to harm himself. *See id.* ¶¶ 53-55.  Dr. Gasparo confirmed Mr. Lyle's previous diagnoses and his classification at MH4, but changed the dosage of the anti-depressant, Effexor, and discontinued both suicide watch and the use of the anti-psychotic medication Risperadol.  *See id.* ¶ 27.

Plaintiff also alleges that Dr. Gasparo instructed that Mr. Lyle be transferred out of specialized housing and into the Charlie Unit, where he was transferred later that day.  *See id.* ¶ 28.  Mr. Lyle was placed in cell 206 of the Charlie Unit, a cell that he shared for the next three days with Thomas Walker, a convicted inmate serving his prison sentence at Garner.  *See id.* Plaintiff alleges that Mr. Walker "was a high risk mental health inmate with a documented history of aggression[,] which included a conviction for attempted murder."  *Id.*  On or about May 16, Mr. Lyle wrote to a friend, expressing anxiety about sharing a cell with Mr. Walker. *See id.* ¶ 30.

Inmates housed in the Charlie Unit – apparently unlike those in the specialized housing unit where Mr. Lyle was held from May 11 until May 15 – have the ability to turn the cell's lights on and off at will.  *See id.*  Additionally, the Charlie Unit has bunk-style beds, which are outfitted with standard-issue sheets and pillow case – both of which would play a role in Mr. Lyle's suicide.  Once transferred to the Charlie Unit, Mr. Lyle was given standard DOC clothing, whereas previously he had been given only a "suicide gown."  *See id.*

Defendant Samson, who worked for CMHC as a Licensed Mental Health Counselor, *see id.* ¶ 5, evaluated Mr. Lyle on May 16 in order to develop a treatment plan for his mental health needs, *id.* at ¶ 31.  Plaintiff alleges that both Mr. Samson and Dr. Gasparo failed to examine Mr. Lyle's mental health records – which allegedly contained extensive documentation of past

7

suicide attempts and serious mental health needs – despite their ready availability. *See id.* ¶¶ 32-33, 54-59.  Additionally, Plaintiff alleges that after Mr. Walker was transferred out of the Charlie Unit on May 19, Mr. Samson, as well as Dr. Gasparo, Lt. Gagnon, and other DOC staff, knew from their personal observations that Mr. Lyle continued to be housed in a cell by himself, in contravention of DOC policies regarding detainees with Mr. Lyle's identified mental health needs. *See id.* ¶¶ 35-36.

Mr. Lyle allegedly had his last encounter with Dr. Gasparo during a five minute "unscheduled" encounter on May 20, when Mr. Lyle forcibly grabbed the doctor while they were both at the Charlie Unit's nursing station. *See id.* ¶ 37.  Mr. Lyle allegedly demanded that Dr. Gasparo adjust his medication, complaining that it was causing him insomnia and not to feel "right." *See id.*  Dr. Gasparo agreed to change the dosage of Mr. Lyle's anti-depressant medication, and while he noted the adjustment on a physicians' orders sheet, Plaintiff alleges that he failed to do so with regard to Mr. Lyle's clinical records, meaning that neither Mr. Samson nor the other DOC staff were aware of the change in medication or Dr. Gasparo's encounter with Mr. Lyle. *See id.* ¶¶ 38-42, 66.  The following day, May 21, Mr. Lyle had an informal discussion with Mr. Samson, in which Mr. Lyle again complained of insomnia-caused anxiety, which he ascribed to his medication. *See id.* ¶ 43.  Mr. Lyle allegedly requested reading material of Mr. Samson, who was unable to provide any at that time. *See id.*  Plaintiff alleges that Mr. Samson failed to notify anyone of Mr. Lyle's anxiety. *See id.*

Mr. Lyle took his own life later that evening.  Plaintiff alleges that during all times relevant to the remainder of the allegations, Defendant Lt. Gagnon had assigned Defendant Corrections Officer Swan the task of making irregular checks of all cells in the Charlie Unit, to be conducted approximately every 15 minutes, *see id.* ¶ 44, and Defendant Corrections Officer

Standish the responsibility for monitoring video surveillance of the Charlie Unit, *see id.* ¶ 45.
Plaintiff alleges that from approximately 10:26 p.m. until 11:01 p.m., Mr. Lyle could be
observed on the video surveillance equipment exhibiting "fidgety" behavior, and appeared to be
"on the look out for DOC custody staff and Defendant Swan's, (sic) regular fifteen minute tours."
*Id.* ¶ 46.  The Complaint also alleges that Mr. Lyle could be seen standing for several minutes at
a time by the cell's upper bank, with his back turned to the camera and with the lights off.  *See id.*
Mr. Lyle would allegedly turn the lights on after moving away from the top bunk.  *See id.*  This
behavior allegedly continued for some time, during which Mr. Lyle was apparently fashioning a
noose out of a torn bedsheet, which he tied to the upper portion of the top bunk.  *See id.* ¶¶ 46-
47.

Defendant Swan discovered the fruits of Mr. Lyle's labor at approximately 11:01 p.m.
while conducting a flashlight check of his cell.  *See id.* ¶ 47.  By that time, however, it was too
late, as Mr. Lyle had stopped breathing and was without a pulse.  *See id.*  An ambulance was
called at approximately 11:04, and Mr. Lyle was placed on a gurney at approximately 11:14,
after which he was transported to Danbury Hospital.  *See id.* ¶ 49.  He was pronounced dead at
approximately 11:50.  *See id.*  A subsequent autopsy concluded that Mr. Lyle's death was caused
primarily by asphyxia by neck compression, and secondarily by heart failure.  *See id.* ¶ 50.

Approximately a year after Mr. Lyle's death, DOC Captain Hardy, a non-party, presented
a report that resulted from a DOC investigation into Mr. Lyle's death.  *See id.* Count IV ¶ 58.
Captain Hardy's review of the surveillance video allegedly led to the conclusion that it was
"readily apparent" that in the time prior to his suicide, Mr. Lyle was monitoring the attempts of
the DOC custody staff to watch him through their irregular cell checks.  *See id.*  The Complaint
also alleges that Captain Hardy concluded that the DOC custody staff failed to adhere to an

administrative directive requiring them to interact with and/or search Mr. Lyle in the period preceding his suicide. *See id.*

## III.

The Court first considers Counts One and Two, which allege that Dr. Gasparo and Mr. Samson, respectively, failed to provide Mr. Lyle with adequate mental health care, and Count Four, which alleges that Corrections Officers Swan and Standish essentially did the same. Although a convicted prisoner's allegations of inadequate health care are evaluated under the Eighth Amendment's prohibition of cruel and unusual punishment, the comparable rights of a pretrial detainee, such as Mr. Lyle, are secured by the Due Process Clause of the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996); *but see Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

The due process rights of a pretrial detainee are violated if a custodial official "denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856. This standard has both objective and subjective components. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). As to the former, the detainees medical condition must be "sufficiently severe" in objective terms.

> The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." In

> addition, where the denial of treatment causes plaintiff to suffer a permanent loss
> or life-long handicap, the medical need is considered serious.

*Pimentel v. Deboo*, 411 F. Supp. 2d. 118, 128 (D. Conn. 2006) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d. Cir. 1998)).

While the objective component has to do with the detainee's medical needs, the subjective component of the deliberate indifference standard focuses on what the defendant knew at the time of the alleged deprivation.  *See Caiozzo*, 581 F.3d at 72; *Hathaway*, 37 F.3d at 66.  In short, the detainee must show that the defendant had "a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66.  Standing alone, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Daniels v. Williams*, 474 U.S. 327, 333 (1986), and nor do "[d]ifferences of opinion between a prisoner and prison officials concerning the appropriate response and treatment of a medical complaint."  *Chance*, 143 F.3d at 702; *see also Hernandez v. Keane*, 341 F.3d 137, 145-47 (2d Cir. 2003).  Rather, "[d]eliberate indifference, in this context, may be shown by evidence that the official acted with reckless disregard for the substantial risk posed by the detainee's serious medical condition."  *Weyant*, 101 F.3d at 856.  Although "a plaintiff must show 'something more than mere negligence,' . . . proof of intent is not required, for the deliberate-indifference standard 'is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

Thus, in considering a motion to dismiss, courts must evaluate whether the plaintiff has pled facts that, if true, and taken with all reasonable inferences drawn in favor of plaintiff, would demonstrate that the defendant "'kn[ew] of and disregard[ed] an excessive risk to [the plaintiff's] health or safety,'" and that the defendant "was 'both . . . aware of facts from which the inference

could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference.'" *Caiozzo*, 581 F.3d at 72 (quoting *Farmer*, 511 U.S. at 837) (all but third alteration in original).  A prison official who is aware of a risk of harm to an inmate and responds reasonably to the risk will not be found liable, even if the harm threatened by that risk is ultimately not prevented.  *See Farmer*, 511 U.S. at 844-45.

There is no disputing that Mr. Lyle had "serious medical needs" within the meaning of the deliberate indifference standard, as evidenced both by the DOC classifications indicating (at times) that he was a serious threat to himself, as well as by his eventual suicide.  *See Chance*, 143 F.3d at 702.  Defendants also do not seem to argue that Dr. Gasparo, Mr. Samson, or Corrections Officers Swan and Standish were unaware of the Mr. Lyle's serious medical needs and the risks they posed.  *See* Defs.' Mem. [doc. # 36] at 21-23.  Instead, Defendants contend that the Complaint does not contain sufficient allegations demonstrating that they "disregard[ed] an excessive risk to [Mr. Lyle's] health or safety."  *Caiozzo*, 581 F.3d at 72 (citation and quotation marks omitted).  "At best," Defendants argue, "plaintiff sets forth his own disagreement with the course of treatment which [Mr. Lyle] received," Defs.' Mem. [doc. # 36] at 21, which "do not nudge his claim of deliberate indifference across the line from conceivable to plausible," *id.* at 23.  The Court disagrees.

While Plaintiff may ultimately be unable to prove that this was more than a disagreement about the proper course of treatment, she has alleged facts that, if true, demonstrate more than mere negligence and/or medical malpractice on the part of Defendants.  The crux of Plaintiff's Complaint is that Defendants ignored abundant evidence demonstrating that Mr. Lyle was an acute suicide risk – in the form of Judge Ward's instructions, Mr. Lyle's prior medical records, contemporaneous complaints and behavior, and examinations by DOC medical staff, all of

12

whom concluded that Mr. Lyle suffered from severe mental health issues.   Despite this information, Defendants placed Mr. Lyle in a cell by himself; where he was only checked on periodically; with access to materials from which he could fashion a noose and a sufficiently-elevated leverage point from which to hang it (and himself); and with the ability to turn the lights off to obscure his activities.   Plaintiff has also alleged that even as Mr. Lyle's mental condition worsened, his complaints of insomnia and his visible agitation were essentially ignored, in seeming contravention of the DOC's own classification of Mr. Lyle as MH4,[2] which, as mentioned, indicates a "[m]ental [h]ealth disorder severe enough to require specialized housing or ongoing intensive mental health treatment."   DOC Objective Classification Manual 29.  Plaintiff's allegations regarding other violations of DOC policy – including those identified in Captain Hardy's report, as well as the failures of Dr. Gasparo and Mr. Samson to notify other DOC staff members of the encounters they each had with Mr. Lyle on the day before and the day of his suicide, during which Mr. Lyle allegedly exhibited heightened agitation and anxiety – also suggest that Defendants recklessly ignored the risk that Mr. Lyle would attempt to harm himself.

The Court cannot say that these allegations, if true, and with all reasonable inferences drawn in Plaintiff's favor, do not amount to deliberate indifference.   *See, e.g.*, *Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (reversing a the dismissal of a prisoner's complaint that sufficiently alleged that defendants ignored his serious medical needs despite being made aware of them); *Allah v. Kemp*, No. 08CV1008, 2010 WL 1036802, at *6 (N.D.N.Y. Feb. 25, 2010) (denying a Rule 12(b)(3) motion for judgment on the pleadings, and rejecting defendants arguments that their failure to take more affirmative steps to prevent plaintiff from attempting

---

[2] Plaintiff also seems to suggest that the classification itself was in error – i.e., that Mr. Lyle should have been classified as MH5, which would require even more supervision.  *See* DOC Objective Classification Manual 29-30.

suicide was, at most, a mistake "in their exercise of psychiatric judgment"); *Estate of Rodriguez v. Simon*, No. 06CV125, 2007 WL 2154238, at *5 (D. Vt. Mar. 30, 2007) (denying a motion to dismiss and rejecting the defendants' argument that placing a pretrial detainee on 15-minute checks, and nothing more, was a reasonable response to the risk that the detainee would harm himself).

The Court does not doubt that individuals in the Defendants' positions face difficult decisions on a daily basis regarding how to respond appropriately to a detainee's serious mental health needs. *See Farmer*, 511 U.S. at 845. Moreover, it is axiomatic that if the evidence demonstrates that the Defendants reacted reasonably to the risk that Mr. Lyle could harm himself, they cannot be held liable for the tragedy that ultimately transpired. *See id.* at 844-45. Nonetheless, the Court is unable to conclude at this early stage – and on the basis of the Complaint alone – that the Defendants were not deliberately indifferent to Mr. Lyle's serious mental health needs. The Court must await further development of the facts. *See Chance*, 143 F.3d at 703 ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case."). Accordingly, Defendants' Motion to Dismiss [doc. # 35] Counts One, Two and Four is DENIED. However, Defendants are free to renew their arguments in the form of a motion for summary judgment.

## IV.

The Court next considers Count Three of the Complaint, which alleges that Lt. Gagnon violated Mr. Lyle's due process rights by failing adequately to supervise Corrections Officers Standish and Swan. Defendants argue that Plaintiff has not pleaded sufficient facts demonstrating that Lt. Gagnon's actions (or inactions) played a causal role in Mr. Lyle's alleged due process deprivation. *See* Defs.' Mem. [doc. # 36] at 15-17.

14

Section 1983, through which Plaintiff seeks to vindicate Mr. Lyle's rights to due process, imposes liability upon those individuals whose actions – taken under color of law – cause "a deprivation of rights secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983). This causation requirement is not an empty formality; rather, to state a valid cause of action under § 1983, a plaintiff must allege that each named defendant had personal participation in the alleged constitutional deprivation. Liability may not be premised on *respondeat superior*, "linkage in the prison chain of command," or even "the allegedly unlawful conduct of [one's] subordinates," absent a showing that the supervisor had some personal involvement in the alleged deprivation. *Hernandez* 341 F.3d at 144-45 (citations and quotation marks omitted); *see also Iqbal*, 129 S.Ct. at 1952 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). The Second Circuit has identified the following ways that a supervisor, such as Lt. Gagnon, can be held liable under § 1983:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez*, 341 F.3d at 145.

Since Plaintiff's claim in Count Three, like those claims already discussed, allege a violation of Mr. Lyle's due process rights, it, too, is evaluated according to the deliberate indifference standard outlined above. *See Caiozzo*, 581 F.3d at 72. Here again, there seems to be no disputing that Plaintiff has alleged that Lt. Gagnon knew that Mr. Lyle had serious medical needs; the dispositive inquiry is thus whether Lt. Gagnon's conduct exhibited reckless disregard

for the risk that Mr. Lyle could harm himself.  In this regard, Plaintiff has alleged that Lt. Gagnon is liable for the violation of Mr. Lyle's rights to due process in four ways: (a) by permitting Mr. Lyle to continue to be housed with a convicted inmate, Mr. Walker, even after becoming aware of that fact, *see* Compl. [doc. # 31] Count III ¶¶ 56-58; (b) by permitting Mr. Lyle to be housed by himself once Mr. Walker was transferred, in alleged contravention of DOC policies and despite his knowledge that this isolation could exacerbate the mental health problems of detainees like Mr. Lyle, *see id.* ¶¶ 59-61; (c) by failing to ensure that the Charlie Unit was adequately staffed at shift changes, *see id.* ¶ 62; (d) and by failing to instruct custody staff – in particular, Corrections Officers Swan and Standish – to actively watch Mr. Lyle and to document his behavior patterns, *see id.* ¶ 63.  The Court will discuss each of these claimed bases for liability.

Plaintiff's first claimed basis for liability as to Lt. Gagnon, housing Mr. Lyle with a convicted and allegedly dangerous inmate, Mr. Walker, is also a basis for two of the equal protection claims, and will be discussed in more detail below.  For present purposes, the primary problem with this claimed basis for Lt. Gagnon's liability is that Plaintiff also appears to allege that it was Dr. Gasparo – and not Lt. Gagnon – who was responsible for the decision to place Mr. Lyle in the Charlie Unit.  *See* Compl. [doc. # 31] ¶¶ 27-29.  Plaintiff has alleged that Dr. Gasparo made this decision, after evaluating Mr. Lyle, on the basis of his medical judgment.  *See id.*  As mentioned, Plaintiff has alleged that this decision (and others) of Dr. Gasparo was made with deliberate indifference to the risk that Mr. Lyle could harm himself, but she has nonetheless alleged that it was Dr. Gasparo's decision.  Although Plaintiff has alleged that Lt. Gagnon had some training with regards to caring for mentally ill detainees, she has not alleged that Lt. Gagnon was a doctor or other medical professional.  And yet, imposing liability on Lt. Gagnon

16

for the decision to house Mr. Lyle either with a convicted felon or by himself would fault Lt. Gagnon for not overriding Dr. Gasparo's medical recommendation.  It is one thing to hold Dr. Gasparo liable for his actions vis-à-vis a mentally ill patient, but it is quite another to say that Lt. Gagnon not only *could have*, but actually *did* conclude that Dr. Gasparo's recommendation to house Mr. Lyle in the Charlie Unit exposed him to an excessive risk of suicide, and that Lt. Gagnon then ignored that risk.  At most, the Complaint alleges only that Lt. Gagnon *could have* reached this conclusion, on the basis of his observation of Mr. Lyle's housing situation, *see* Compl. [doc. # 31] Count III ¶¶ 56-61; it nowhere alleges that Lt. Gagnon actually reached this conclusion, nor is that a reasonable inference, given Dr. Gasparo's recommendation.  Without reaching that conclusion, Lt. Gagnon cannot have been deliberately indifferent to Mr. Lyle's serious medical needs – for he could not have recklessly disregarded a risk of which he was not aware. *See Farmer*, 511 U.S. at 837; *Caiozzo*, 581 F.3d at 72.  For these reasons, neither of the first two claimed bases for Lt. Gagnon's liability are sufficient to hold him liable under § 1983.

The Court reaches the same conclusion as to the other two claimed bases of Lt. Gagnon's liability.  The third alleges that Lt. Gagnon was responsible for the Charlie Unit being inadequately staffed during shift changes, while the fourth claims that Lt. Gagnon failed to adequately instruct DOC staff to supervise Mr. Lyle.  *See* Compl. [doc. # 31] Count III ¶¶ 62-63. The fourth can be dispensed with quickly; as Plaintiff alleges, the DOC had a specific directive in place requiring exactly what he complains did not happen with Mr. Lyle – that DOC personnel keep him under constant surveillance and interact with him at frequent, irregular intervals.  *See id.* ¶¶ 25-26 (discussing "Administrative Directive 8.14").  Absent allegations that this was not actually what was required of the Charlie Unit staff – and there are none – holding Lt. Gagnon liable for his subordinates' failure to adhere to the policy is exactly the kind of vicarious liability

that is not permitted under § 1983.  *See Iqbal*, 129 S.Ct. at 1952.

Finally, Plaintiff's allegations Lt. Gagnon knew "that immediately preceding a shift change and during a shift change at the facility that the custody staff could not adequately supervise inmates housed on Charlie Unit," Compl. [doc. # 31] Count III ¶ 62, is simply too conclusory to support what Plaintiff must show – that Lt. Gagnon knew of, but recklessly ignored, an excessive risk that Mr. Lyle could harm himself.  *See Caiozzo*, 581 F.3d at 72.  At most, this allegation, if true, could suggest negligence.  But given the other protocols and policies in place – including the evaluation of Mr. Lyle by mental health professionals and the requirements regarding surveillance of and interactions with Mr. Lyle – this allegation cannot support the inference that a jury would have to draw to find that Lt. Gagnon was personally involved in the alleged deprivation of Mr. Lyle's right to due process.  *See Weyant*, 101 F.3d at 856.

In sum, Plaintiff has failed to allege sufficient facts that Lt. Gagnon was personally involved in constitutional deprivation at issue.  Accordingly, Defendants' Motion to Dismiss [doc. # 35] is GRANTED as to Count Three, and Lt. Gagnon is dismissed from this case.  Since the liability of the DOC was predicated on the liability of Lt. Gagnon, as its policymaker, it, too, is dismissed as a defendant.  That said, however, should Plaintiff uncover facts during the course of discovery that leads her to believe that Lt. Gagnon was personally involved to a degree not already alleged, she may seek the Court's permission to amend her complaint accordingly and to bring Lt. Gagnon back into the case.

## V.

The Court next considers Plaintiff's claim that Mr. Lyle's constitutional rights were violated when Defendants placed him in a cell with Mr. Walker, a convicted inmate.  Though the

Complaint labels this claim a violation of Mr. Lyle's rights to equal protection under the Fourteenth Amendment to the United States Constitution and Sections 9 and 20 of Article First of the Connecticut Constitution, in opposing dismissal, Plaintiff has recast this claim as a violation of due process, arising only under the Fourteenth Amendment.  See Pl.'s Mem. [doc. # 41-1] at 27-28.  Since Defendants, too, seem to treat this claim as if it alleges a due process violation, *see* Defs.' Mem. [doc. # 36] at 23-24, the Court will do the same.

"[R]estrictions on pretrial detainees that implicate a liberty interest protected under the Due Process Clause may not 'amount to punishment of the detainee.'"  *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  "Absent a showing of an expressed intent to punish," whether a particular restriction "is imposed for a legitimate purpose or for the purpose of punishment 'generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"  *Id.* (quoting *Bell*, 441 U.S. at 538 (alterations in original)); *see also United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (per curium) (focusing the inquiry on "whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to these concerns" (quotation marks omitted)).

Additionally, while the Complaint suggests at times that Mr. Walker had violent propensities, *see* Compl. [doc. # 31] ¶ 28, and that Mr. Lyle may have even felt threatened by him, *see id.* ¶ 30, it does not allege that Mr. Walker ever harmed Mr. Lyle – at least not in a manner distinct from Plaintiff's allegations, already discussed, regarding Defendants' deliberate indifference to Mr. Lyle's mental health issues.  Instead, the crux of this claim is the assertion that it is a *per se* violation of the Due Process Clause to house pretrial detainees and convicted

inmates together.  *See* Pl.'s Mem. [doc. # 41-1] at 27.  Plaintiff asserts that "Defendants actions in housing Lyle with a convicted inmate violated his constitutional rights under the Fourteenth Amendment unless the State can show that there was a legitimate penological interest to be served."  *Id.*  The Court disagrees.

In support of her claim that housing pretrial detainees with convicted inmates is a due process violation, Plaintiff cites *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. 1981) (en banc), *cert. denied*, 453 U.S. 911 (1981), *overruled on other grounds*, *Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986).  *Jones* was a class action brought on behalf of both pretrial detainees and convicted inmates held at the Jackson County jail in Pascagoula, Mississippi.  The Fifth Circuit found that a number of policies and conditions at the jail violated the Constitution, including the policy of segregating prisoners by race; "gross[] overcrowd[ing]," resulting in a variety of unsanitary and inhumane conditions; rampant and widely-tolerated prisoner-on-prisoner abuse, including "a prisoner-run kangaroo court that inflicted physical and sexual abuse on other prisoners"; and, most relevant to this litigation, the housing of pretrial detainees with convicted inmates, who were treated identically for all relevant purposes.  *See id.* at 1374-75.  Among the holdings in its wide-ranging opinion, a divided Fifth Circuit held that "[t]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is reasonably related to the institution's interests in maintaining jail security, or physical facilities do not permit their separation."  *Id.* at 1374 (citations and quotation marks omitted).

Despite the misgivings of the dissenters, *see, e.g.*, *id.* at 1391 (Coleman, C.J., dissenting in part), *Jones* remains good law today within the Fifth Circuit, though the exceptions delimited for holding pretrial detainees with convicted inmates have been predictably explored in

subsequent litigation.   *See, e.g.*, *Bland v. Terrebonne Parish Crim. Justice Complex*, No. 09CV4407, 2009 WL 3486449, at *4-5 (E.D. La. Oct. 23, 2009) (dismissing as frivolous a pretrial detainee's claim, premised on *Jones*, because his "extensive criminal histor[y]" made the decision to house him with convicted inmates "reasonably related to the institution's interest in maintaining jail security"); *Abrams v. Jones*, No. 03CV2278, 2004 WL 1197099, at *8 (E.D. La. May 28, 2004) (holding that the defendant was entitled to summary judgment because the ratio of inmates to cell blocks and the need to "keep inmates involved in gangs or ongoing feuds in separate blocks, makes it impossible to separate all pretrial detainees from convicted inmates"); *Schwartz v. Jones*, No. 99CV3269, 2001 WL 118600, at *8 (E.D. La. Feb. 9, 2001) (dismissing a pretrial detainee's claim because "[t]he layout of the prison required that the small number of pretrial detainees be housed with convicted DOC prisoners").

This appears to be a matter of first impression within the Second Circuit.  However, other courts that have considered the issue after *Jones* have reached considerably more limited holdings.  In general, they have found that absent allegations that the pretrial detainee suffered an injury from being housed with one more convicted inmates, or that the placement with convicted inmates was intended to punish the pretrial detainee, the pretrial detainee's rights to due process are not violated merely because he is forced to share a cell with a convicted prisoner.  *See, e.g.*, *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir. 1988) (affirming summary judgment to defendants where the pretrial detainee had not alleged or offered evidence that he was injured by his cell placement with convicted inmates), *cert. denied*, 488 U.S. 863 (1988); *Brodak v. Nichols*, 162 F.3d 1161, 1998 WL 553032, at *2 (6th Cir. Aug. 17, 1998) (unpublished) ("[T]he placement of pretrial detainees in a county jail facility with convicted inmates does not violate the Eighth Amendment, without evidence demonstrating that a pretrial detainee was injured by

the cell placement."); *Baskin v. Wayen County*, No. 05CV70475, 2006 WL 2844543, at *4 (E.D. Mich. 2006) (granting summary judgment to defendants because plaintiff had not adduced evidence of either an intent to punish or that his placement with convicted inmates was the result of deliberate indifference); *Martin v. Kerney*, No. 00CV1055, 2002 WL 531553, at *1 (D. Del. Mar. 27, 2002) ("[A] lawfully held pretrial detainee does not have a liberty interest in being housed in a separate unit from sentenced inmates."); *Burciaga v. County of Lenawee*, 123 F. Supp. 2d 1076, 1078-79 (E.D. Mich. 2000) (same as *Baskin*); *Faulcon v. City of Philadelphia*, 18 F. Supp. 2d 537, 540 (E.D. Pa. 1998) (granting summary judgment to defendants because "Plaintiff presents no evidence to support his contention that the commingling of [pretrial detainees with convicted prisoners] is so obviously dangerous that to allow it to occur is deliberately indifferent."); *Chapman v. Guessford*, 924 F. Supp. 30, 33 (D. Del. 1996) (same as *Kerney*); *Hoover v. Watson*, 886 F. Supp. 410, 417 (D. Del. 1995) (same), *aff'd* 74 F.3d 1226 (3d Cir. 1995); *but see Ryan v. Burlington County*, 674 F. Supp. 464, 478 (D.N.J. 1987) ("[P]retrial detainees have a constitutional right to be housed separately from known dangerous convicted inmates who pose a threat to their personal security unless physical facilities do not permit their separation."), *aff'd* 860 F.2d 1199, 1204 (3d Cir. 1988).

Plaintiff has not alleged that Mr. Lyle was placed with Mr. Walker as a punitive measure, or that Mr. Lyle suffered an injury on account of this arrangement.  At most, the Complaint suggests that sharing a cell with Mr. Walker exacerbated Mr. Lyle's already troubled mental state; if the evidence bears that out, that fact may be relevant to Plaintiff's claim of deliberate indifference – assuming, as already discussed, that there is evidence that the Defendants were aware of this risk, but recklessly disregarded it.  *See Caiozzo*, 581 F.3d at 72.

But insofar as this allegation, standing alone, involves no more than a dignitary harm, it

cannot support an independent due process claim.  Not even *Jones* or *Ryan*, the two cases most supportive of Plaintiff's argument, stand for that proposition.  As the Court alluded to above, the conditions at the prison in *Jones* were extraordinary.  *See Jones*, 636 F.2d at 1373 ("Confinement in a prison where terror reigns is cruel and unusual punishment.").  And while the Complaint alleges that the conditions at the Garner were insufficient as to Mr. Lyle's particular needs, Plaintiff has not alleged that the facility suffered systemic failures that extended beyond the admittedly tragic circumstances of Mr. Lyle's death.  Even *Ryan*, arguably the best case for Plaintiff, involved allegations not present here; there, the pretrial detainee had been rendered quadriplegic by the beating at the hands of a cellmate, who was a convicted prisoner, and thus suffered an injury traceable to the placement itself.  *See* 674 F. Supp. 464, 466.

Since Plaintiff has alleged neither an injury nor an intent to punish, she cannot premise a due process claim on the mere fact that Mr. Lyle was forced to share a cell with a convicted inmate.  *See Burciaga*, 123 F. Supp. 2d at 1078-79 ("[T]he overwhelming weight of persuasive authority holds that . . . unless the state acts with the impermissible intent to punish a pre-trial detainee or is deliberately indifferent to a pre-trial detainee's safety, it does not violate the due process clause to house that pre-trial detainee with a sentenced inmate.").[3]  As a consequence, the Court grants the motion to dismiss Counts Five and Seven to the extent they are premised on housing Mr. Lyle with a convicted prisoner.

---

[3] Even if the Court were to conclude that housing pretrial detainees with convicted inmates was a *per se* violation of due process (which it does not), the fact that essentially no court has so held – not even, as explained, *Jones* or *Ryan* – would mean the Defendants would be entitled to qualified immunity on such a claim.  *See Pearson v. Callahan*, ___ U.S. ___, ___, 129 S.Ct. 808, 815 (2009); *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) ("Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citations and quotation marks omitted)).

# VI.

Plaintiff next claims that Mr. Lyle's rights to equal protection were violated because he was treated differently from other pretrial detainees similarly situated with respect to the mental health treatment that he received. Plaintiff does not, however, allege that Mr. Lyle was treated differently because of his membership in a protected class. *See Page v. Lantz*, No. 05CV1271(MRK), 2007 WL 1834519, at *6 (D. Conn. June 25, 2007). Therefore, the Court construes Plaintiff's equal protection allegations as asserting a claim under the so-called "class of one" theory articulated by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). *See Page*, 2007 WL 1834519, at *6. Plaintiffs asserting an *Olech*-type equal protection claim must establish that they "were treated differently from similarly situated [individuals] . . . , and that there was no rational basis for the difference in treatment." *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (citations omitted). On the first part of the test, the level of similarity required is remarkably high; in fact, the Second Circuit has explained that "the standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005);[4] *see also Doninger v. Niehoff*, 594 F. Supp. 2d 211, 227-28 (D. Conn. 2009); *Blackhawk Sec., Inc. v. Town of Hamden*, No. 03CV2101(MRK), 2005 WL 1719918, at *3-5 (D. Conn. July 22, 2005); *Piscottano v. Murphy*, No. 04CV682(MRK), 2005 WL 1424394, at *8 (D. Conn. Jun. 9,

---

[4] *Neilson* applied *Olech* to the context of public employment; three years later, however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, ___, 128 S. Ct. 2146, 2151 (2008). Thereafter, the Second Circuit "overrule[d] [*Neilson*] . . . to the extent that it conflicts with the holding of *Engquist*." *Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008). "Nevertheless, *Neilson*'s discussion regarding 'similarly situated' individuals in the context of class-of-one equal protection claims remains valid." *Lavoie-Francisco v. Town of Coventry*, 581 F. Supp. 2d 304, 313 n.6 (D. Conn. 2008), *aff'd* 352 Fed. Appx. 464 (2d Cir. 2009) (summary order).

2005).  To meet this high burden, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson*, 409 F.3d at 105.

In support of this claim, Plaintiff asserts only that Mr. Lyle's rights to equal protection were violated when he did not receive the adequate mental health care to which he was entitled. *See* Compl. [doc. # 31] Count V.  This is plainly insufficient to state a viable "class of one" claim, most obviously because Plaintiff has not endeavored to allege the existence of a comparator – much less one that meets the exacting standard of an *Olech* claim.  The similarly-situated inquiry is usually a fact-intensive one, *see Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006), but Plaintiff's failure to allege the existence of a comparator (after having been given a chance to amend the complaint to address Defendants' arguments) means that this claim fails as a matter of law.  *See Page*, 2007 WL 1834519, at *6; *Piscottano*, 2005 WL 1424394, at *9.

## VII.

Finally, the Court turns to Plaintiff's state-law claims, which consist of Count Six and Seven, alleging violations of §§ 9[5] and 20,[6] respectively, of Article First of the Connecticut Constitution; and Count Eight, for wrongful death.  Although the Complaint suggests that Counts

---

[5] The Connecticut Constitution, Article First, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[6] The Connecticut Constitution, Article First, § 20, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

Six and Seven are brought under § 1983, violations of state law are not cognizable under § 1983. *See Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Therefore, the Court construes Counts Six and Seven as alleging causes of action arising directly under the Connecticut Constitution. In *Binette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court authorized a damages action for violations of Article First, §§ 7 and 9 of the Connecticut Constitution, dealing with illegal searches and seizures. *See Binette*, 244 Conn. at 47. The *Binette* Court cautioned, however, that its holding "does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* And indeed, in the dozen years since *Binette* was decided, courts have been quite reluctant to recognize direct causes of action for violations of other provisions of the Connecticut Constitution. *See generally Doninger*, 594 F. Supp. 2d at 228-29 (collecting cases); *Lopez v. Smiley*, 375 F. Supp. 2d 19, 24 (D. Conn. 2005) (same, in the prison context).

Plaintiff does not discuss Counts Six and Seven in her brief in opposition to the motion to dismiss, and that omission, in and of itself, would be sufficient to cause the Court to dismiss those claims. The Court is unaware of any cases that have recognized a *Binette*-style cause of action under Article First, § 20 of the Constitution, and at least one court has declined to extend *Binette*'s holding to permit a prisoner to sue his guards for damages under § 9. *See Torres v. Armstrong*, No. CV990427057S, 2001 WL 1178581, at *7 (Sept. 6, 2001); *see also Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 356 (D. Conn. 2001) ("The court finds that there is no private cause of action for monetary damages under the equal protection and due process provisions [Art. First, §§ 1, 8, and 20] of the Connecticut Constitution."). "When faced with state law claims that 'raise[] novel and complex issues of state law,' a district court, in its discretion, may decline to exercise supplemental jurisdiction over such claims." *Lopez*, 375 F.

26

Supp. 2d at 25 (quoting 28 U.S.C. § 1367(c)).  Moreover, the Second Circuit has instructed that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Young v. New York City Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

Given that Counts Six and Seven raise novel and undeveloped issues of state law, and out of the deference owed to the State as the final arbiter of its own Constitution, the Court, in its discretion, declines to exercise supplemental jurisdiction over these claims.  Therefore, they are dismissed without prejudice.  Plaintiff may, of course, file them in state court, but it is decidedly not this Court's role to create new remedies under Connecticut's Constitution. *See Doninger*, 594 F. Supp. 2d at 228-29; *Lopez*, 375 F. Supp. 2d at 24.

As for Count Eight, alleging wrongful death, the Court concludes that Plaintiff has pleaded a proper claim. "No action for wrongful death existed at common law or exists today in Connecticut except as otherwise provided by the legislature."  *Rzayeva v. United States*, 492 F. Supp. 2d 60, 65 (D. Conn. 2007) (citing *Ecker v. Town of West Hartford*, 205 Conn. 219, 231 (1987)).  Connecticut's wrongful death statute provides, in relevant part, that "In any action . . . for injuries resulting in death . . . [the] executor or administrator may recover from the party legally at fault."  Conn. Gen. Stat. § 52-555(a).  However, a separate statutory provision, Conn. Gen. Stat. § 4-165, provides immunity for state employees in their personal capacity[7] for all

---

[7] By virtue of sovereign immunity, state employees are already immune from suits against them in their official capacity.  *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity).   For the same reason, Plaintiff's claims under § 1983 against the individual Defendants' in their official capacities are barred by sovereign immunity.  *See Quern* v. *Jordan*, 440 U.S. 332, 342 (1979) (Section 1983 does not override a state's Eleventh

actions causing injuries, so long as the injuries were "caused in the discharge of his or her duties or within the scope of his or her employment," and were not "wanton, reckless, or malicious." Conn. Gen. Stat. § 4-165(a); *Miller v. Egan*, 265 Conn. 301, 319 (2003).  Should a plaintiff wish to file suit against the State itself or a state official in her official capacity, the plaintiff must "'present . . . [the] claim against the state' to the State Claims Commissioner who may authorize suit against the state or state official." *Sadler v. Lantz*, No. 07CV1316, 2009 WL 3013716, at *7 (D. Conn. Sept. 16, 2009) (quoting Conn. Gen. Stat. § 4-165(a)); *see also* Conn. Gen. Stat. § 4-160 (explaining the claims procedures).  When filing a lawsuit against the State or a state official in her official capacity, "the plaintiff must allege that he or she sought 'authorization and the date on which it was granted." *Sadler*, 2009 WL 3013716, at *7 (quoting Conn. Gen. Stat. § 4-160(c).

In the Complaint, Plaintiff does allege that she presented a claim to the Connecticut Claims Commissioner on May 11, 2009.  *See* Compl. [doc. # 31] Count VIII ¶ 63.  However, the Complaint does not allege (or even suggest) that the Claims Commissioner authorized suit against the State.  Therefore, insofar as Count Eight asserts a claim against the State of Connecticut and the individual Defendants in their official capacities, it is barred by sovereign immunity.  *See Miller*, 265 Conn. at 319.

On the other hand, if the Complaint sufficiently alleges that the individual Defendants were "wanton, reckless, or malicious," Conn. Gen. Stat. § 4-165(a), the claims against those Defendants in their personal capacities may proceed.  *See Miller*, 265 Conn. at 319.  The Court has previously held that the Complaint contains sufficient factual allegations to support – at least

---

Amendment).  Therefore, Defendants' Motion to Dismiss [doc. # 35] the § 1983 claims against the individual Defendants in their official capacities is GRANTED.

this early stage – a claim of deliberate indifference against Dr. Gasparo, Mr. Samson, and Corrections Officers Swan and Standish.  As mentioned, to state a successful claim of deliberate indifference, a plaintiff must allege facts that, if true, would support an inference that the defendants recklessly ignored an excessive risk to the detainee's health or safety.  *See Caiozzo*, 581 F.3d at 72.  Thus, the Court has already concluded that Plaintiff has alleged sufficient facts to suggest that these four Defendants acted recklessly as to Mr. Lyle's mental health needs. Absent evidence that the recklessness standard is different in the deliberate indifference context than it is in the context of Conn. Gen. Stat. § 4-165, the Court adheres to that ruling here as well, and Defendants' Motion to Dismiss [doc. # 35] Count Eight is DENIED as to Dr. Gasparo, Mr. Samson, and Corrections Officers Swan and Standish in their personal capacities.  But as previously discussed, there is insufficient evidence that Lt. Gagnon acted recklessly, and therefore the Motion to Dismiss [doc. # 35] Count Eight against him – and all other Defendants save the four previously named – is GRANTED.

## VIII.

In summary, and for the reasons stated above, all claims against the DOC and the individual Defendants in their official capacities are DISMISSED; Defendants' Motion to Dismiss [doc. # 35] Counts One, Two, Four and Eight is DENIED as to Defendants Dr. Gasparo, Mr. Samson, and Corrections Officers Swan and Standish in their personal capacities, but it is GRANTED as to Counts Three and Five.  All claims against Lt. Gagnon are dismissed unless and until Plaintiff learns of facts during discovery that show his personal involvement in the issues that underlie this action, in which case Plaintiff can ask the Court to amend the Complaint to bring Lt. Gagnon back into the case.  Additionally, the Court declines supplemental jurisdiction as to Counts Six and Seven, and therefore those claims are DISMISSED without

prejudice.

The claims and defendants remaining are as follows: Count One, against Dr. Gasparo in his personal capacity; Count Two, against Mr. Samson in his personal capacity; Count Four, against Corrections Officers Swan and Standish in their personal capacities; and Count Eight, against Dr. Gasparo, Mr. Samson, and Corrections Officers Swan and Standish, all in their personal capacities.


IT IS SO ORDERED.


/s/   Mark R. Kravitz_____
      United States District Judge


**Dated at New Haven, Connecticut: May 27, 2010.**