**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARIA SILVERA, ADMINISTRATRIX | : | |
| OF ESTATE OF ANDRE MARIO LYLE, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:09-cv-1398 (VLB) |
| DEPT. OF CORRECTIONS, ET AL | : | |
|     Defendants. | : | March 14, 2012 |

**MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT [Dkt. #43]**

I.      **Introduction**

As Judge Kravitz noted, "[t]his case arises out of the tragic suicide death of 22-year-old Andre Mario Lyle on May 21, 2009 during his pretrial detention at the Garner Correctional Institute in Newtown, Connecticut." Plaintiff, Maria Silvera (hereinafter "Silvera") brings this action for damages, as the administrator of Andre Mario Lyle's  (hereinafter "Lyle") estate, against the Defendants, Dr. Peter Gasparo (hereinafter "Dr. Gasparo") in his individual capacity, Professional Counselor Samson (hereinafter "Counselor Samson") in his individual capacity, Corrections Officer Standish (hereinafter "Officer Standish") in his individual capacity and Corrections Officer Swan ("Officer Swan") in his individual capacity. Silvera alleges that while in the custody of the Department of Corrections as a pre-trial detainee, Lyle received inadequate mental health care resulting in his suicide. In particular, Silvera raises claims of inadequate mental health care (Count One), denial of medical care (Count Two), substantive due process violations (Count Three) and wrongful death (Count Four).

1

Silvera's inadequate mental health care claim alleges that Dr. Gasparo deliberately disregarded Lyle's safety and health by failing to follow-up and evaluate Lyle's adjustment to his housing placement and his medication dosage change and by failing to alert custody staff to Lyle's adjustment issues.  As a result of the foregoing, the plaintiff alleges that Lyle was allowed to commit suicide by hanging on May 21, 2008 and seeks compensatory damages pursuant to 42 U.S.C. § 1983.

Silvera's denial of medical care claim alleges that Counselor Samson failed to alert custody staff to the deteriorative change in Lyle's mental health status and failed to notify custody staff that Lyle should not have been maintained in single cell housing without constant supervision at a time when he was experiencing adjustment issues and insomnia caused by a change in medication. As a result of these alleged deprivations of medical care, the plaintiff claims that Lyle's self-imposed hanging constituted cruel and unusual punishment in violation of the Fourteenth Amendment.

Additionally, Silvera asserts substantive due process violations alleging that Officers Swan and Standish's failure to employ, utilize and implement certain policies and procedures created a significant risk of lethal consequences to Lyle. As a result of these deficiencies, Silvera claims that Lyle suffered the loss of his life while under their custody.

Lastly, Silvera alleges wrongful death under Conn. Gen. Stat. § 4-147 asserting that the four defendants' intentionally breached the respective duties of

care that they owed to Lyle when they acted with reckless disregard for Lyle's liberty.

Currently pending before the Court is a renewed motion for summary judgment asserting the Plaintiff's inability to prove that any of the Defendants were deliberately indifferent to Lyle or acted willfully, wantonly and maliciously. Furthermore, the Defendants assert that their conduct is protected by qualified and statutory immunity.

## II.    Factual Background

The parties' pleadings and submissions in connection with the motion for summary judgment establish the following facts.

### Arrest

Lyle was arrested on April 11, 2008 in the Town of Manchester and charged with carrying a dangerous weapon, carrying a firearm and breach of peace.  [Dkt. #150, Ex. 2, Pl. Rule 56 Stmt., ¶6]; [Dkt. #150, Pl. Ex. 7]. Lyle appeared in the Manchester GA12 Court on April 14, 2008 and was ordered by the presiding judge to be detained pending the resolution of his criminal case, held in protective custody and placed on medical and mental health watch. [Dkt. #150, Ex. 2, Pl. Rule 56 Stmt., ¶7]; [Dkt. #150, Pl. Ex. 8].

### Hartford Correctional Center

On April 14, 2008 following his court appearance Lyle was transported to the Hartford Correctional Center (hereinafter "HCC"). [Dkt. #136, Ex. 3, Defs. Rule 56 Stmt., ¶5).  Upon admission to HCC, licensed professional counselor (hereinafter "LPC") Lou Viscosi met with Lyle and performed a suicide risk

assessment. *Id.* at ¶11.  LPC Viscoi discussed the charges with Lyle and reported that Lyle became tearful and estimated that he was facing two and a half years of jail time. *Id.* at ¶7; [Dkt. #151, Ex. 19].  Lyle stated that he has a support system and a girlfriend. *Id.* Viscosi noted that Lyle was future oriented and mentioned that he planned to hire a paid attorney. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶8]; [Dkt.#151, Ex. 19]. Lyle also mentioned that he thought he would be able to keep his job as a store clerk. Lyle denied having any suicidal intent, stating "I don't want to kill myself. I really don't feel like that." [Dkt. #151, Pl. Ex. 19].  The suicide risk assessment indicated that Lyle reported overdosing on two occasions, most recently in July 2005, three days after being discharged from the Department of Corrections. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶12]. Lyle also reported overdosing at the age of 14 and driving a car at high rates of speed when depressed or upset. *Id.* at ¶13.

LPC Viscosi concluded that given the recent stress and the fact that Lyle had been without medication for the last three days, he should be placed in South Block as a Mental Health Level ("MH") 5. *Id.* at ¶14.  An MH 5 indicates that an inmate has or may have an acute mental health condition requiring that he be placed in a unit with 24 hour nursing care. *Id.* at ¶15. Lyle's mental health screening indicated that his hygiene, eye contact, and psychomotor skills were all appropriate and his thought processes, attention and concentration were normal. *Id.* at ¶16.

Lyle was also evaluated by APRN Fritz on April 14, 2008. [Dkt. #136, Ex. 3, Defs. Rule 56 Stmt., ¶17].  APRN Fritz noted that Lyle had firearms charges

4

against him and claimed to have bought the gun with the intent to use it on himself. *Id.* at ¶18. APRN Fritz also noted that Lyle reported two prior suicide attempts. *Id.* at ¶19. APRN Fritz prescribed 225 mg of Effexor, an anti-depressant, and placed Lyle on suicide watch, giving him a safety blanket and gown. *Id.* at ¶20.

Lyle was re-evaluated by Supervising Psychologist Nowinski two days later on April 16, 2008 who noted that Lyle insisted he was not suicidal on intake. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶22]. Lyle admitted to having a history of suicide attempts at home when he felt hopeless but reported that he did not feel that way during his evaluation with Dr. Nowinski. *Id.* at ¶23. Dr. Nowinski reported that Lyle was easily engaged, calm and cooperative, and had good eye contact. Lyle stated that he expected to do some time, but did not seem overly concerned. *Id.* at ¶24. Dr. Nowinski noted that Lyle had been in general population at HCC on previous admissions and requested to go to general population for more social contact. *Id.* at ¶25. Dr. Nowinski also noted that Lyle was compliant with taking his medication, had a depression diagnosis by history. Dr. Nowinski discontinued Lyle's suicide watch, decreased his classification to MH 3, and cleared Lyle for orientation to HCC. *Id.* at ¶26. A classification of MH 3 indicates that an inmate has a mild or moderate mental health disorder that may or may not be on psychotropic medication. *Id.* at ¶27.

Later on April 16, 2008, Lyle was seen by psychiatric social worker ("PSW") Maldonado because of an emergency request, stating "I am stressed, there is nothing to do in this place." [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶28]. PSW

Maldonado noted that Lyle denied being suicidal or having homicidal ideations and hallucinations.  *Id.* at ¶29.  PSW Maldonado provided Lyle with reading materials.  *Id.*  PSW Maldonado saw Lyle the next day, after Lyle made another emergency request for mental health services stating that he forgot to state that he had difficulty sleeping.  *Id.* at ¶30.  PSW Maldonado reassured Lyle that he would be seen again by the APRN or psychiatrist who would address the insomnia issues.  *Id.* at ¶31.

Lyle was next seen on May 8, 2008 after making an emergency request to be seen stating that the night he got arrested, he tried to kill himself with the gun but when he tried to shoot himself in the head, his gun jammed.  *Id.* at ¶32. As a result of this emergency meeting, Lyle was re-classified as an MH Level 5 and was moved to South Block and placed on suicide watch subject to fifteen minute checks. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶33]; [Dkt. #150, Pl. Ex. 15].  On may 9, 2008, Lyle was evaluated in S-block at his cell door in response to his yelling and banging.  [Dkt. #150, Pl. Ex. 15].  Lyle stated that he was upset that he was on suicide watch, and commented "I'm gonna be here for the whole weekend."  *Id.* Lyle was agitated and frustrated.  *Id.* The physician discussed his situation and counseled him on coping with the situation. *Id.* Lyle was receptive to counseling and denied having any suicidal or homicidal ideations.  *Id.*  The suicide watch was maintained. *Id.*

APRN Fritz saw Lyle again three days later, on May 11, 2008.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶34].  Lyle stated that that he was feeling depressed, had chest pains and his hands were shaking.  [Dkt. #151, Pl. Ex. 12].  Lyle stated that

he wanted a magazine to keep his mind off of his problems.  *Id.*  Lyle admitted to telling the mental health clinician that at the time of his arrest he had tried to kill himself but the gun jammed.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶34].  Lyle stated that he was mostly depressed when he woke up, but was sleeping adequately; his speech was at a normal rate and rhythm, volume and syntax.  *Id.* at ¶35.  APRN Fritz noted that Lyle had bruising in his eyes from punching himself earlier in the week. *Id.* at ¶36.  APRN Fritz opined that based upon his old records, Lyle might have a psychosis and thus she prescribed an anti-psychotic medication, Risperdal in addition to the Effexor he was taking for depression.  *Id.* at ¶37.

The next day, on May 12, 2008, APRN Fritz sought to transfer Lyle to Garner but was unable to do so due to DOC policies preventing the transfer of patients classified as MH Level 5.  [Dkt. #151, Ex. 12].

On May 13, 2008, Lyle was seen by Dr. Nowinski, the supervising psychologist at HCC who noted that Lyle was cooperative and compliant with medication.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶38].  Later that day, after being seen by Dr. Nowinski, Lyle's mental health classification was changed to MH Level 4, meaning he had a mental health disorder severe enough to require specialized housing and or ongoing intensive mental health treatment and that he was on psychotropic medication.  *Id.* at ¶39.

<u>Garner Correctional Institution</u>

Lyle was transferred to Garner Correctional Institution ("Garner") on May 13, 2008 for Mental Health 4 treatment housing.  *Id.* at ¶47.  At the time of his

7

transfer, Lyle had a diagnosis of Dysthymic Disorder which is a chronic type of depression in which a person's moods are regularly low.  *Id.*  At the time of his transfer Lyle was taking Effexor for symptoms of depression and had recently been prescribed Risperdal for possible psychosis.  *Id. at* ¶49.  Upon admission to Garner, Lyle denied suicidal intent or plan.  *Id. at* ¶51.

Garner houses MH Level 4 inmates and assigns inmates to different housing sections within Garner based on their level of functioning, measured by their GAF Scores.  [Dkt. #150, Pl. Ex. 10, Dep. of Marmora p. 30 & 33].  Upon arrival at Garner, Lyle had a GAF of 50-53 and was housed at C block.  [Dkt. #150, Pl. Ex. 6, Dep. of Gasparo p. 55; Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶53].  C block was a mental health housing unit with approximately 73 inmates suffering from moderate mental health issues.  *Id.* at ¶137.  Lyle was placed in a cell with inmate Thomas Walker.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶136].  Lyle was housed with Inmate Walker until May 19, 2008 when Walker was transferred to restrictive housing after receiving a disciplinary report.  *Id.* at ¶136.

On May 13, 2008, the day of his arrival at Garner, Lyle was seen by a nurse clinician who noted that he was alert, oriented to person, place and time and that he denied feeling suicidal or homicidal.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶55].  Lyle also denied suffering from any auditory or visual hallucinations and denied having any medical or mental health issues at the time.  *Id.* at ¶56.  On May 14, 2008, one week prior to his suicide, Lyle wrote a letter to an acquaintance he referred to as "Ice," asking for monetary help with his court case.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶104].

Two days after his transfer to Garner, on May 15, 2008, Dr. Gasparo, a licensed psychiatrist, met with Lyle for a minimum of one hour and noted that Lyle thought that at worst he would receive 2 years on his pending firearm charges. *Id. at* ¶57. Lyle reported that he was working full time, had a girlfriend, was living on his own and did not use drugs but drank a little bit. *Id.* at ¶58. Lyle also reiterated his history of depression and medical treatment for depression and his most recent attempt to take his own life with a gun. *Id.* at ¶¶59-61. Lyle reported that when he was depressed, he teared easily, felt tired, felt lazy, was sleepy, had a loss in appetite and felt suicidal but not daily. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶62].

During his meeting with Dr. Gasparo, Lyle denied feeling suicidal or homicidal. *Id.* at ¶63. Dr. Gasparo noted that he was calm, cooperative with normal speech and affect. *Id.* at ¶64. Dr. Gasparo discontinued Lyle's prescription for Risperdal after discussing with Lyle the fact that it was an anti-psychotic with risks. *Id.* ¶65. Dr. Gasparo and Lyle agreed the risks outweighed any benefits. *Id.* at ¶66. Dr. Gasparo continued Lyle's Effexor for depression but evened out the dosage from 150 mg in the morning and 75 mg at night to 112.5 mg in the morning and 112.5 mg at night. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶68]. A possible side effect of Effexor can be anxiety and Lyle was reporting some anxiety during the day. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶70]. By more evenly distributing the dosage of Effexor, Dr. Gasparo hoped to ensure a more consistent and level blood level. [Dkt. #136, Ex. 8, Dep. of Gasparo p. 66].

Dr. Gasparo concluded that Lyle had a GAF of 50-55 indicating that he was able to take care of his activities of daily living, able to communicate effectively with others in a rational manner, could sustain employment or school and could be placed into a higher functioning block. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶72]. Dr. Gasparo's evaluation and findings were detailed in Lyle's health services record. *Id.* at ¶73. As a result, Dr. Gasparo discontinued Lyle from suicide watch status and recommended his transfer to a higher functioning unit. [Dkt. #151, Pl. Ex. 27 p. 9]

The next day, on May 16, 2008, Lyle was seen by Licensed Professional Counselor Wordy Samson. *Id.* at ¶74. Lyle again denied having suicidal or homicidal ideations. *Id.* at ¶75. Lyle informed LPC Samson that his mother had kicked him out of the house when he was 16 and that he was afraid that he might be deported because of his pending charges. *Id.* at ¶76. Lyle reported that he was well adjusted to the unit. *Id.* at ¶77. LPC Samson noted that Lyle presented as stable and in good spirits. *Id.*

Three days later, on May 19, 2008, Mr. Walker was place in restrictive housing and the Unit Manager, Ms. Marmora, put a hold on Lyle's cellmate, Walker's bed in C block. *Id.* at ¶139. It was the practice of Garner to place a hold on the beds of inmates who are temporarily reassigned to a specialized unit such as the restrictive housing unit. *Id.* at ¶140. Generally, when a hold is placed on an inmate's bed, the cellmate will remain in the cell by himself until his cellmate returns to the unit. *Id.* at ¶147. This was and continues to be a common practice at Garner in the mental health housing units. *Id.* at ¶148. The Plaintiffs note that

this practice is not reflected in Garner's current unit directives.  [Dkt. #150, Ex. 2, Pl. Rule 56 Stmt., ¶140; Dkt. #150, Pl. Ex. 27 p. 8].

Mr. Walker testified that when Lyle first was placed in his cell, he noticed Lyle was crying, and Walker tried to comfort him by talking to him, asking him what was going on and offering to "assist him on how to think about his situation." [Dkt. #150, Ex. 4, Dep. of Thomas Walker, p. 30].  Walker then notified a correctional officer walking by that Lyle was crying. *Id.* at 29. During the period of time, approximately a week, in which he shared a cell with Lyle, prior to his placement in restrictive housing, Lyle conveyed thoughts of committing suicide to him. *Id.* at p. 6. Walker stated that Lyle "walked away from mental health, came back into the cell, sat for about ten minutes, not saying nothing. And asked how people hang up around here." *Id.* at 6. Walker clarified that Lyle was asking how he could commit suicide by hanging himself. *Id.* at 6-7. Walker further testified that after this conversation with Lyle he notified the correctional officer on duty that "my cellie needs to speak with mental health. Asap, as soon as possible," but that he could not recall the officer's name and he did not inform the officer that Lyle had asked about how to commit suicide. [Dkt. #150, Ex. 4, Dep. of Thomas Walker, pp. 7, 28.  Walker further testified that he did not think Lyle would act on his suicidal thoughts, stating "he didn't seem like the type. . . He was, he wasn't quiet, he wasn't talking about his case or anything. He just  - - about the moment." *Id.* at p. 28.  Walker stated that he did not mention Lyle's comment to anybody else because he didn't think Lyle would try to commit suicide. *Id.* at p. 29.

On May 20, 2008, Dr. Gasparo again saw Lyle when Dr. Gasparo was in C Block.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶78].  Lyle requested that Dr. Gasparo change his dosage of Effexor back to 125 mg in the morning and 75 mg at night because he thought the change in dosage was adversely effecting his ability to fall asleep at night.  *Id.* at ¶79.  Lyle stated that he thought the dosage was better the way it was originally.  *Id.* at ¶80.  Dr. Gasparo asked Lyle if he was sure, and Lyle indicated that he was.  *Id.*  Dr. Gasparo also asked if everything else was okay and Lyle stated that it was.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶81].  Dr. Gasparo changed Lyle's medication back to 125 mg in the morning and 75 mg at night.  *Id.* at ¶82.  Dr. Gasparo did not note this medication dosage change in Lyle's clinical record as required by University of Connecticut Health Center/Correctional Managed Health Care ("UCHC/CMHC") policy.  [Dkt. #150, Pl. Ex. 17, p. 4 and 9].

Later that evening, Lyle Called LPC Samson to his cell and asked him for a magazine.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶85].  LPC Samson searched for a magazine and was unable to find one.  *Id.*  Lyle did not complain to LPC Samson about an inability to sleep and didn't complain about being in the cell by himself. [Dkt. #150, Pl. Ex. 2, Dep. of Marmora p. 55-57].

Maria Silvera, Andre Lyle's mother, who testified that she had a wonderful relationship with her son, spoke by phone with her son twice, once on May 20th and once on May 21st 2008.  *Id.* at ¶¶ 108-09.  Ms. Silvera believed her son was more hyper or agitated than usual.  *Id.* at ¶110.  Ms. Silvera did not feel the need to contact anyone about Lyle's state of mind.  *Id.* at ¶111.  Ms. Silvera testified

that during their second telephone call, during the evening of May 21, 2008, her son asked her to find another bondsmen and she assured him that she was going to do everything she could to get him out.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶112].  Ms. Silvera testified that she never saw her son's suicide coming.  *Id.* at ¶113. Lyle wrote a note to his mother just prior to his death which included instructions for arrangements after his death.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶106]

The MH 4 housing units at Garner are monitored by tours conducted every fifteen minutes, consistent with the National Commission on Correctional Health Care guidelines. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶52]. In May 2008, Garner correctional staff toured C block every 15 minutes.  *Id.* at ¶150.  These tours were conducted on an irregular basis, meaning that they were not always conducted on the hour, fifteen minutes past, thirty minutes past or forty five minutes past. *Id.* at ¶151.  Rather, the times of the tours would be staggered, at a maximum of every fifteen minutes.  *Id.* at ¶152.  Officer Swan toured the unit every fifteen minutes the evening of May 21, 2008.  *Id.* at ¶153.  Two video cameras (C-Pod Dayroom Cameras #016 and #017) recorded the C Block of Garner on the night of May 21, 2008, including Officer Swan's tours of the Unit and some of Lyle's movements within his cell.  [Dkt. #151, Ex. 27, pp. 8-9]. The video recording indicates that between approximately 10:30pm and 11:01pm on May 21, 2008, Lyle was moving around in his cell, standing at his cell window and looking out, then moving out of view, and then returning to the cell window, a pattern reflected on the video several times.  *Id.* at 9. The video also indicates that at 10:51pm, Lyle

turned the cell lights off and then on and then off again. *Id.*  During this period, as reflected on the video, Officer Swan toured the housing unit between 10:26 pm and 10:30pm, and again between 10:47 pm and 10:50pm. *Id.*  At 10:58pm, Officer Swan conducted a cell count, checking cell to cell with a flashlight, and noticed inmate Lyle hanging in his cell at 11:01pm. *Id.*; *see also* [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶154];   Officer Standish was in central control monitoring the stationary cameras in the various units including C block. *Id.* at ¶155.

Officers Standish and Swan report that it is a common practice for inmates to look out their cell window into the unit at various times of the day and evening. *Id.* at ¶160.  Neither Swan nor Standish believed or thought that Lyle was intending to commit suicide when he turned off his cell light at approximately 10:51pm and then turned it back on again.  *Id.* at ¶161.  Defendants assert that it takes less than one minute for an inmate to fashion a noose from a bed sheet and to hang himself.  *Id.* at ¶164.  Officer Standish was never in C block the evening of Lyle's suicide.  [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶171].

III.    Standard of Review

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' [Fed.R.Civ.P. 56(a)]. The moving party bears the burden of proving that no factual issues exist. [*Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010)]. 'In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.' [*Id.,*

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))]. 'If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied.' [*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted)]. In addition, '[a] party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.' [*Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09civ1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011)].

IV.   **Discussion**

    A. **Counts One and Two: Claims against Dr. Gasparo and LPC Samson for Failure to Provide Adequate Mental Health Care**

    Plaintiff, Silvera, contends that Defendants Gasparo and Sampson demonstrated a deliberate indifference to an obvious and well-documented risk that Lyle would attempt to commit suicide.   Silvera asserts that Gasparo and Sampson were familiar with Lyle's DOC medical records detailing a strong history of depression and suicidal ideations and attempts, and from direct conversations

with Lyle during which Lyle described his prior suicidal endeavors, including his most recent attempt on April 18, 2008, immediately preceding his placement in the custody of the DOC, that Lyle suffered from chronic depression, Dysthemic Disorder, and recurrent psychotic tendencies. Gasparo and Sampson were also aware, Silvera asserts, that Lyle was transferred from Hartford Correctional Center to Garner Correctional Institute, a detention facility designed to cater to detainees with moderate to severe mental health needs, as a result of Lyle's chronic depression and episodes of self-inflicted harm while at HCC.

Silvera argues that, despite these clear indications of Lyle's risk of suicide, Defendants Gasparo and Sampson failed to provide Lyle with adequate care to prevent him from taking his own life. In particular, Silvera contends that Gasparo failed to follow up with Lyle after his initial screening interview to inquire as Lyle's reaction to the changes in medication and dosage or to follow up on Lyle's complaints of insomnia and anxiety. Silvera further contends that as a result of Gasparo's failure to follow up with Lyle at all, Lyle was forced to reach out for Dr. Gasparo's attention on May 20, 2008 as Gasparo passed through the C-Unit of Garner to plead for Gasparo to again modify the dosage of his depression medication. Silvera asserts that Gasparo also failed to implement a Mental Health Plan for Lyle, including an appropriate housing and custody plan, placing Lyle at risk of lethal physical harm. Silvera claims that Gasparo should have recognized, given his training and experience, that Lyle was demonstrating signs of severe anxiety and depression indicative of an acute risk of suicide, and responded accordingly by closely monitoring his behavior and symptoms as he adjusted to

his new housing and medication changes. Therefore Silvera seems to assert that the basis for the deliberate indifference claims is both a failure to recognize indications of an acute risk of suicide, and a failure to provide adequate protection to prevent against suicide.

Defendants assert that Plaintiff has failed to present facts to establish that Lyle was actively suicidal at the time of his death. Rather, Defendants assert that Lyle repeatedly denied being suicidal throughout his detention and did not demonstrate any behavior either on the date of his death or the days leading up to his death to indicate to the Defendants that he was planning or contemplating committing suicide. Moreover, Defendants provided expert testimony opining that the care Lyle received from Defendants Gasparo and Samson was consistent with applicable medical community standards of care and appropriately responded to Lyle's past and present symptoms.[1] Defendants assert that Lyle's death resulted from his failure to alert the staff at Garner to his needs or to seek help.

---

[1] The Court notes that portions of expert testimony offered by Defendants in support of their motion for summary judgment were not considered by the Court as the testimony addressed adequacy of the care provided and would " 'usurp the role of the jury in applying the law to the facts before it.' " *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). For example, the Defendants offered expert testimony stating that "[i]t is Dr. Ducate's expert opion that there is nothing in Lyle's health record to indicate that clinical staff at Garner had any indication or should have had any indication that Lyle was planning to harm himself during the limited time the staff had to assess him prior to his suicide." This testimony addresses the question of whether or not the Defendants were aware that Lyle was acutely suicidal, a critical element of the deliberate indifference standard. The Second Circuit has "consistently held . . . that expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not 'aid the jury in making a decision; rather it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir.

At the outset, the Court notes that the Eighth Amendment is not applicable to Lyle as a pre-trial detainee, instead Silvera's constitutional claims regarding Lyle's care while in custody are to be analyzed under the Due Process Clause of the Fourteenth Amendment. *See Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). However, as the Second Circuit has made clear, "it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Id.* Thus, "[c]laims for deliberate indifference to a serious medical condition or other threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eight or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009).

The standard for evaluating a claim of deliberate indifference incorporates both a subjective and an objective component. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). First, the objective component requires a plaintiff to show that he or she had a "serious medical condition."  *See Caiozzo*, 581 F.3d at 71. The Second Circuit has recognized several factors as relevant to the inquiry into the seriousness of the medical condition, including: "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698 (2d Cir. 1998) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

---

2005) (internal quotations omitted). Accordingly, the Court has overlooked those portions of expert testimony which seek to supplant the jury's role as trier of fact to determine whether the facts alleged support a finding of deliberate indifference.

As Judge Kravitz noted in his decision on the motion to dismiss, "[t]here is no disputing that Mr. Lyle had 'serious medical needs' within the meaning of the deliberate indifference standard, as evidenced by both the DOC classifications indicating (at times) that he was a serious threat to himself, as well as by his eventual suicide." [Dkt. #50, p. 12]; *see also Zimmerman v. Burge*, No. 9:06-cv-0176 (GLS/GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases holding that a history of depression and suicide attempts is a sufficiently serious medical condition within the context of deliberate indifference).

The subjective component requires the plaintiff to establish that the defendant acted "with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285 (1976).  Although there existed previously some question as to whether an objective or subjective standard applied in the context of a Fourteenth Amendment deliberate indifference claim, the Second Circuit resolved this ambiguity holding that the standard is indeed subjective, as articulated by the Supreme Court in *Farmer v. Brennan*, 51 U.S. 825, 837, 114 S.Ct. 1970 (1994). *See Caiozzo*, 581 F.3d at 65 ("Because the Supreme Court in *Farmer* articulated the proper standard for analyzing such claims under the Eight Amendment- a standard that we have already applied in *Cuoco* to a Fifth Amendment due process case- we adopt that standard in this case under the Due Process Clause of the Fourteenth Amendment.").  Thus, as the Supreme Court made clear in *Farmer*, the culpability component of the deliberate indifference standard is

subjective and requires a knowing disregard of "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference [of a substantial risk of harm]."  *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994). As the Supreme Court explained, this subjective standard, requiring both awareness of facts indicating a substantial risk of harm and an inference of a substantial risk of harm drawn from those facts, is necessary to distinguish between "cruel and unusual '*conditions*'" and "cruel and unusual '*punishments*,'" as only the latter are prohibited under the Eighth Amendment. *Id.* (emphasis added).  Therefore, as Supreme Court further elaborated, "an official's failure to alleviate a significant risk that he *should have perceived by did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

The question of whether "a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. (internal citation omitted). If evidence is presented as to the obviousness of the risk, a prison official may challenge the claim of deliberate indifference by showing "that the obvious escaped him." *Id.* However, an officer may not hide behind willful blindness, as the Supreme Court noted in *Farmer* that an officer "would not escape liability if the evidence showed that he merely refused to verify the underlying facts that he strongly suspected to

be true, or declined to confirm inferences of risk that he strongly suspected to exist . . ." *Id.* at 843. Prison officials may also rebut circumstantial evidence presented of an obvious risk of harm by establishing that they were unaware of this risk, "for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844. Alternatively, where it is established that prison officials were aware of a substantial risk to inmate health or safety, such officials "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

In sum, in the context of detainee suicide, "deliberate indifference may exist pursuant to one of two broad fact scenarios." *See Kelsey v. City of New York*, No. 03-CV-5978 (JFB)(KAM), 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006), *aff'd*, 306 Fed.Appx. 700 (2d Cir. 2009). "First, state officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies. Alternatively, the detaining authorities could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner in which they respond to the recognized risk of suicide, an inquiry which focuses on the adequacy of preventative measures." *Id.;* see also *Rellegert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir. 1991).

Here, the Court notes that Plaintiff, Silvera, seems to allege both variations of deliberate indifference, arguing both that the Defendants failed to recognize

obvious signs that Lyle was suffering from an acute risk of suicide, despite his long and well-documented history of chronic depression and suicide attempts, and recent incidents of self-harm and anxiety, *and* that the Defendants failed to provide adequate care to prevent against this risk.

Beginning first with the allegation that Defendants Gasparo and Samson failed to recognize that Lyle was suffering from an acute risk of suicide, the Court notes that the record is replete with indications that Defendants Gasparo and Samson were aware of Lyle's extensive history of depression and suicide attempts. Defendants dispute neither this history nor their awareness of it. Rather, Defendants dispute that Lyle manifested prior to his death an acute risk of suicide.

The subjective component of the deliberate indifference standard, as articulated by the Supreme Court in *Farmer* is clear that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." 511 U.S. at 837. Although awareness of a substantial risk of harm may be established through circumstantial evidence "by the very fact that the risk was obvious," the Court finds that Silvera has failed to identify a material factual dispute regarding whether or not it was obvious that Lyle faced a substantial risk of suicide. While Lyle's history of depression and prior suicide attempts indicated a possibility that Lyle would make another suicide attempt, there was no indication during Lyle's detention between April 14, 2008 and May 21, 2008 that Lyle was at risk of an imminent suicide attempt.

Silvera identifies several details which she asserts indicate an obvious risk of suicide. First, Silvera notes that prior to Lyle's transfer to Garner on May 13, 2008, Lyle was reported to have been punching himself in the face and banging and screaming at his cell door. Moreover, Silvera refers to the fact that Dr. Nowinski noted on May 13, 2008 that Lyle was low-functioning and suffering from Major Depressive Disorder with Psychotic Features. However, these facts are not disputed by Defendants. Further, these details are referenced in isolation, overlooking the litany of facts indicating that Lyle was not in fact suffering from an acute risk of suicide. Silvera does not dispute that Lyle consistently denied suffering from any suicidal or homicidal ideation. Nor does Silvera dispute a multitude of facts indicating that Lyle was largely stable and not experiencing a heightened state of depression.

Silvera admits that when Lyle met with Dr. Gasparo on May 15, 2008, shortly after his transfer to Garner, Lyle openly discussed his history of depression and his attempt to take his life on April 14, 2008, reported that he was working full time, had a girlfriend, and that thought that at most he was facing a possible two years of jail time on his pending firearm charges. As a result of this rational and calm conversation, addressing future-oriented topics, Dr. Gasparo discontinued Lyle from suicide watch status, raised Lyle's GAF score from a 30, or low functioning, to a 50-55, indicating that he was "able to take care of his activities of daily living, able to communicate effectively with others in a rational manner, could sustain employment or school, and could be placed in a higher functioning block."[Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶72].

Silvera admits that On May 16, 2008 Lyle met with Licensed Professional Counselor Samson, and again denied having suicidal or homicidal ideations. During the conversation, Lyle discussed the fact that his mother kicked him out of the house when he was sixteen years old, and that he was afraid he might be deported because of his pending charges. Silvera further admits that Lyle reported that he was well adjusted to the unit, and LPC Sampson noted that he seemed stable and in good spirits.

The only facts identified by Silvera as indicative of Lyle's acute risk of suicide include Lyle's behavior in his cell with Walker and question regarding how to hang himself, and the fact that Lyle "grabbed" Dr. Gasparo in C Block and requested to have the evening dosage of his depression medication returned to its original level because he was having trouble sleeping. These facts fail to create a material factual dispute regarding an obvious risk of suicide. Lyle's difficulty falling asleep would not have indicated a heightened risk of suicide given Lyle's prior testimony to Dr. Gasparo that he became lethargic when depression. Further, although Walker testified that he notified a correctional officer on two separate occasions that his cellmate required the attention of mental health professionals, Walker was unable to remember the name of the correctional officer that he notified, and Silvera has provided no evidence to demonstrate that this information was ever conveyed to either Defendant Gasparo or Defendant Samson. Additionally, Silvera neglects to mention that Walker testified that he did not specifically inform the correctional officer that Lyle was contemplating suicide, he merely informed the correctional officer that

Lyle required medical attention "ASAP."  Silvera also overlooks the fact that Walker testified that he did not persist in his attempts to inform Garner staff of Lyle's comments because he did not feel that Lyle would actually attempt to commit suicide, noting that he did not think Lyle seemed like the suicidal type. Silvera similarly does not acknowledge Lyle's mother's testimony that she did not sense any danger when she spoke to him on the evening of his suicide.

Defendants do not dispute that Lyle reached out to Dr. Gasparo on the evening of May 20, 2008 to request a change in the dosage of his depression medication. Although this request did convey that Lyle was having difficulty sleeping, Lyle made no indication the following day, May 21, 2008, that he was still having difficulty sleeping following the dosage change. Dr. Gasparo's failure to record the dosage change in Lyle's medical records could possibly constitute an act of negligence, however mere negligence cannot establish a claim of deliberate indifference. *See Farmer*, 511 U.S. at 825 (noting that "*Estelle* establishes that deliberate indifference entails something more than mere negligence . . . ").  Similarly, although Lyle requested a magazine from Defendant Samson on the evening of May 20, 2008, consistent with his comments to Defendant Gasparo that he was having difficulty sleeping, Lyle did not reiterate his request for reading materials on May 21, 2008, nor did he give any indication that he was feeling anxious. Plaintiffs have failed to present any evidence to show that Lyle reached out to Garner staff in any way on May 21, 2008.

In sum, Silvera's allegation that Defendants Gasparo and Samson were deliberately indifferent by failing to recognize that Lyle faced an acute risk of

suicide amounts to a challenge to the Defendants medical judgment. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (holding that "[i]ssues of medical judgment cannot be the basis of a deliberate indifference claim."). Silvera essentially asserts that Defendants failed to recognize signs of a potentially escalating mental health crisis, ultimately resulting in an unfortunate and tragic suicide. However Silvera admits the facts which reasonably led the Defendants to conclude that Lyle was in fact stable, although nevertheless continuing to suffer from chronic depression. Therefore where Silvera has failed to identify a material factual dispute regarding an obvious risk of suicide, she cannot establish as a matter of law that Defendants Gasparo and Samson were deliberately indifferent by failing to recognize that Lyle suffered from an acute risk of suicide. Rather, at best, Silvera has identified a potentially negligent act of Defendant Gasparo, and has challenged the exercise of Defendant Gasparo and Samson's medical judgment, neither of which are sufficient to constitute deliberate indifference. *See Curcione*, 657 F.3d at 123; *Farmer*, 511 U.S. at 825.

To the extent that Silvera raises a claim of deliberate indifference asserting that Defendants Gasparo and Samson failed to adequately protect Lyle from the risk of suicide, the evidence is similarly deficient. Silvera asserts that Defendants Gasparo and Samson failed to adequately protect Lyle by failing to conduct a suicide risk assessment of Lyle as required by policy, failing to review Lyle's mental health records, failing to instruct custody staff on Lyle's housing assignment and the level of observation he required.

As previously discussed, in order to constitute deliberate indifference, the standard of care provided must exceed mere negligence or medical malpractice. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation just because the victim is a prisoner."); *see also Weyant*, 101 F.3d at 856 ("Deliberate indifference is a 'mental state more blameworthy than negligence'- it is a 'state of mind that is the equivalent of criminal recklessness.'" (citation omitted).  "[D]eliberate indifference involves unnecessary and wanton infliction of pain, or other conduct that shocks the conscience." *Hathaway*, 99 F.3d at 553. Where a prison official responds reasonably to a known risk of harm to an inmate will not be found liable, even if the harm is ultimately not averted. *See Farmer*, 511 U.S. at 844-45. "Simply laying blame or fault and pointing out what might have been done is insufficient. The question is not whether the [defendants] did all they could have, but whether they did all the Constitution requires." *Rellegert v. Cape Girardeau County*, 924 F.2d 794, 797 (8th Cir. 1991).

The deficiencies Silvera identifies in the Defendants' treatment of Lyle fall short of the standard for deliberate indifference. The assertion that Defendants Garner and Samson violated DOC and Garner policies by failing to conduct suicide and housing assessments is insufficient to create a material factual dispute regarding the adequacy of the care provided to Lyle. Even if the Defendants did not conduct a suicide assessment or housing assessment on the specific forms of paper contemplated by DOC or Garner policies, the record reflects that the Defendants provided Lyle with a significant amount of medical care, treatment, and attention.

Lyle had regular psychiatric care while in custody. Upon arrival at Garner, Lyle was seen by a nurse clinician who noted that he appeared alert, oriented to person, place and time. Lyle denied feeling suicidal or homicidal. Two days later, Lyle met with Dr. Gasparo who conducted what appears to be a thorough review of Lyle's mental health history and current mental state. Lyle appears to have dismissively acknowledged his pending charges, stating that he thought he would receive at worst two years of jail time on his pending charges. Lyle described his current living and employment situations. Lyle reiterated his history of depression and attempts to commit suicide. Lyle also summarized the standard symptoms of his depression, noting that when depressed he teared easily, felt tired, felt lazy, was sleepy, had a loss in appetite and felt suicidal. Lyle confirmed that he did not feel this way on a daily basis. As a result of this consultation, Dr. Gasparo identified Lyle's level of functioning, assigning him to a GAF score of 50-55. Silvera admits that housing assignments within Garner were assessed on the basis of each inmate's level of functioning. The next day, Lyle met with Defendant Samson, again denying any suicidal or homicidal ideations. Lyle discussed his troubled upbringing with Defendant Samson, admitting that his mother had kicked him out of the house at the age of sixteen, and that he feared that he would be deported as a result of his pending charges. Lyle also reported to Defendant Samson that he was well-adjusted to his housing unit. Although Defendants Gasparo and Samson may have failed to memorialize their analyses and conclusions on the forms contemplated by DOC and Garner policies, these facts, uncontroverted by Silvera, evince an assessment of Lyle's

risk of suicide and an analysis of the appropriate level of restrictive housing for Lyle.

The deficiencies of care identified by Silvera, when considered alongside the range of evidence reflecting an awareness of Lyle's history of depression and risk of suicide and ample efforts to protect Lyle from harm fail to create a material factual dispute regarding deliberate indifference such that a rational jury could find that insufficient protective measures were taken by the Defendants. Rather, the evidence reflects that the Defendants responded reasonably to Lyle's exhibited symptoms and mental health needs. Lyle's housing unit was subjected to staggered fifteen minute checks, and the Defendants maintained a video recording of Lyle's housing unit capable of capturing Lyle's movements within his cell. *See Brown v. Harris*, 240 F.3d 383 (4th Cir. 2001) (holding that defendants responded reasonably to [detainee's] presented risk of suicide by playing detainee on medical watch which maintained constant video surveillance of detainee's cell); *see also Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992) (holding that a policy of checking on suicidal inmates every ten minutes did not constitute deliberate indifference).

Lyle's medication requests were monitored evidenced by the fact that his requests for modification of the dosage of his depression medication were acknowledged and honored. *See Estelle*, 429 U.S. at 104-05 (recognizing that proof of deliberate indifference may be found where a prison official "intentionally den[ies] or delay[s] access to medical care or intentionally

interfer[es] with the treatment once prescribed.").  Lyle's death, though tragic, was not the result of deliberate indifference.

Accordingly, the Defendants' motion for summary judgment as to Counts One and Two is GRANTED.  Where the Court finds that no constitutional violation has occurred, the Court need not address the issue of qualified immunity. *See Bukovinsky v. Sullivan County Div. of Health and Family Services*, 408 Fed.Appx. 406, 408 (2d Cir. 2010) (Concluding that where the defendant's conduct did not violate the appellant's constitutional rights, it was not necessary to reach the issue of whether the defendant "enjoys qualified immunity for her actions.").

### B. Count Three: Substantive Due Process Claims against Correctional Officers Swan and Standish

Silvera's third count alleges that Defendants Swan and Standish violated Lyle's substantive due process rights by failing to prevent his death by suicide. Silvera has conceded that summary judgment should enter in favor of Defendant Standish. Accordingly, the Court's analysis will be limited to the allegations against Defendant Swan.

The Second Circuit has held that while in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide.  *See, e.g., Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Weyent v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).  The Supreme Court has held that in order for an injury to be cognizable as a violation of substantive due process a plaintiff must establish that the challenged conduct shocks the conscience.  *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846-47, 118 S.

Ct. 1708 (1998). "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against constitutional action that is incorrect or ill-advised. *Lowrance v.* Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted).

To establish a substantive due process violation, Silvera must establish that Defendant Swan engaged in "egregious conduct which goes beyond merely 'offending some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal' and 'offensive to human dignity' as to shock the conscience." *Smith v. Half Hollow Hills Cet. Sch. Dist.*, 298 F.3d 168 (2d Cir. 2002) (quoting *Rochin v. California*, 342 U.S. 165, 172, 72 S. Ct. 205 (1952)). Very few conditions of prison life are shocking enough to violate a prisoner's right to substantive due process. *Samms v. Fischer*, No. 9:10-CV-0349(GTS/GHL), 2011 U.S. Dist. LEXIS 97810, at *12 (N.D.N.Y. Mar. 25, 2011) (citing *Sandin v. Conner*, 515 U.S. 472, 479 n.4, 484, 115 S. Ct. 2293 (1995) (providing only two examples of the type of condition "shocking" enough to offend substantive due process principles—the transfer to a mental hospital and the involuntary administration of psychotropic drugs)).

The Supreme Court has recognized that "deliberately indifferent conduct" satisfies the "fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." *Cty of Sacramento*, 523 U.S. at 850. Similar to her claims of deliberate indifference against Defendants Gasparo and Swanson, Silvera asserts that Defendant Swan's failure to recognize Lyle's

abnormal behavior as indicative of an acute risk of suicide constitutes a violation of Lyle's substantive due process rights. However, Silvera admits that on May 21, 2008, Defendant Swan toured the C Block housing unit of Garner at 10:50pm, and then checked the cells again at 10:58 pm, and then found Lyle hanging in his cell at 11:01 pm. [Dkt. #150, Ex. 2, Pl. Rule 56 Stmt., ¶154]. Therefore Defendant Swan toured the cell block twice in an eight minute time frame, a frequency of monitoring nearly twice as vigilant as mandated by the National Commission on Correctional Health Care guidelines. [Dkt. #136, Ex. 3, Def. Rule 56 Stmt., ¶52]. Although Defendant Samson's inability to deduce Lyle's suicidal intent led to serious harm, this failure does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. No rational jury could find that Defendant Samson's conduct "shocks the conscience." *Cty of Sacramento*, 523 U.S. at 846-47.

Accordingly, Defendant's motion for summary judgment is GRANTED as to Count Three.

### C.  Count Four: Wrongful Death Claim (against All Defendants)

Silvera's fourth count alleges wrongful death under Connecticut state law. Defendants assert statutory immunity under Connecticut Gen. Stat. §4-165 and argue that the Court should enter judgment in their favor.

"No action for wrongful death existed at common law or exists today in Connecticut except as otherwise provided by the legislature." *Rzayeva v. United States*, 492 F.Supp.2d 60, 65 (D.Conn. 2007) (citing *Ecker v. Town of West Hartford*, 205 Conn. 219, 231 (1987)). Although Silvera failed to identify a

Connecticut statute recognizing a cause of action for wrongful death, the Court acknowledges that such a statute exists. Conn. Gen. Stat. §52-555(a) provides, in relevant part, that "[i]n any action . . . for injuries resulting in death . . . [the] executor or administrator may recover from the party legally at fault." However, as the Defendants have indicated, Conn. Gen. Stat. §4-165 provides immunity for state employees in their individual capacity for damage or injury "caused in the discharge of his or her duties or within the scope of his or her employment," so long as the injury was not caused by "wanton, reckless, or malicious" conduct. Conn. Gen. Stat. §4-165.

Silvera argues that Defendants Gasparo, Samson and Swan acted outside the scope of their authority in failing to abide by DOC and Garner policies and thereby failing to prevent Lyle's suicide. The Connecticut Supreme Court has held that actions fall outside the scope of employment authority when they "misuse governmental authority for personal gain," such that the actions are taken solely in furtherance of a personal interest rather than to carry out a government policy or to advance an interest of the employer or the state. *See Martin v. Brady*, 261 Conn. 372, 377-79 (2002).  Silvera has wholly failed to present evidence indicating that the Defendants actions misused governmental authority for personal gain. Instead, Silvera relies solely on the argument that their actions contravened DOC and Garner policies. Absent any evidence that the Defendants abused their authority for personal gain, no rational jury could find that the Defendants acted outside the scope of their employment authority. Therefore, the

Defendants are entitled to statutory immunity unless their conduct was "wanton, reckless or malicious." Conn. Gen. Stat. §4-165.

Recognizing that they "have never definitively determined the meaning of wanton, reckless or malicious as used in §4-165," the Connecticut Supreme Court has incorporated and applied the common law meaning of these terms in the context of §4-165. *See Martin*, 261 Conn. at 379. As the Connecticut Supreme Court articulated:

> In order to establish that the defendants' conduct was wanton, reckless, willful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts . . . [Such conduct] is more than negligence, more than gross negligence . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or the consequences of the action . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.*

Having concluded that Defendants Gasparo and Samson responded reasonably to Lyle's exhibited signs of suicide risk, it follows that these defendants did not act in a wanton, reckless or willful manner in failing to prevent Lyle from committing suicide. Additionally, Silvera has conceded that summary judgment should enter in Officer Standish's favor as to wrongful death. Therefore the Court need only address Officer Swan's conduct.

Silvera admits that in May 2008 correctional staff toured the C Unit of Garner every fifteen minutes on an irregular basis. Futher, Silvera admits that Defendant Swan toured the unit every fifteen minutes the evening of May 21, 2008. Silvera has simply failed to present any evidence to indicate that Defendant Swan acted in a wanton, reckless or willful manner in failing to prevent Lyle from taking his own life.

Accordingly, Defendants motion for summary judgment as to Count Four for wrongful death is GRANTED.

## V.     Conclusion

Unfortunately, the law does not afford a remedy for every tragic event. Based on the above reasoning, Defendants' motion for summary judgment on Silvera's remaining claims is granted in its entirety. Construing the facts in the light most favorable to Silvera, no rational jury could find that the Defendants were deliberately indifferent to Lyle's risk of suicide, provided him with treatment so inadequate as to shock the conscience, or behaved in a wanton, reckless or malicious manner. Accordingly, it is the Court's duty to and by this order the Court does direct the Clerk to close the file and enter judgment in favor of the Defendants.

IT IS SO ORDERED.
         /s/
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 14, 2012.